1

LOUIS M. BUBALA III
Nevada Bar No. 8974

2

KAEMPFER CROWELL

3

50 W. Liberty Street, Suite 700
Reno, Nevada  89501
Telephone:  (775) 852-3900

4

Facsimile:   (775) 327-2011
Email:  lbubala@kcnvlaw.com

5

6

Attorneys for Creditor Christopher C. Hock

7

UNITED STATES BANKRUPTCY COURT

8

DISTRICT OF NEVADA

9

| In re: | Case No.:  21-50431-mkn |
|---|---|

10

ENCORE AUDIO VISUAL DESIGN, LLC,

11

Debtor.

Case No.:  21-50431-mkn
Chapter 11, Subchapter V

**MOTION TO CONVERT CASE TO CHAPTER 7**

12

Hearing Date:  OST Pending
Hearing Time: OST Pending

13

14

Brazen.  That describes debtor.  In less than three months in bankruptcy, debtor's

15

financials, court filings and testimony reveal the following items.

1.      Debtor paid $30,511.88 in non-wage payments to or for the benefit of debtor's sole

16

owner and managing member, Brad Bolotin.  The majority of those are simple cash withdrawals or

17

transfer to Mr. Bolotin simply coded as a payment to the member.  The payments are continuous

18

from the filing of the bankruptcy on June 8, 2021, through the monthly operating report reflecting

19

operations to August 31, 2021.  The other amounts reflect payments to restaurants, bars, liquor

20

stores, grocery stores, a hotel, a golf course, Mr. Bolotin's personal credit card, and a law firm for

21

work done on behalf of another one of Mr. Bolotin's companies.  The draws and personal

22

payments are inconsistent with debtor's own financials showing the company was insolvent

23

immediately before the bankruptcy.  The payments exceed $11,000 a month, conflicting with (a)

24

Mr. Bolotin's testimony that the company pays $2,000 to $3,000 a month in his personal expenses

rather than a salary, (b) his testimony that he does not take a draw from debtor, and (c) debtor's

proposed plan that provides Mr. Bolotin with a salary of $4,000 a month.

2. Debtor paid $60,242.54 in unauthorized post-petition payments on pre-petition

claims. Debtor made post-petition payments to at least 13 entities that should have been scheduled

as creditors—but are omitted from debtor's schedules as unsecured creditors. Debtor did not seek

court approval to pay them. It paid vendors with which it had an ongoing relationship with, giving

them 100 cents on the dollar. Compare this to the unsecured creditors, including Dr. Hock, whom

debtor projects to pay 1.26 percent at the end of a five-year proposed plan of reorganization.

Debtor is not allowed to pick its favorites among its unsecured pre-petition creditors.

3. Debtor paid $8,289.52 in personal pre-petition payments to or for the benefit of Mr.

Bolotin—in just the one week before he put the company in to bankruptcy. The payments were

disclosed for June 1-7, 2021, the week before the bankruptcy was filed on June 8, 2021, as part of

the June 2021 monthly operation report. Mr. Bolotin admits that before Encore filed for

bankruptcy, he personally did not have an individual bank account. Yet debtor's statement of

financial affairs does not identify any pre-petition payments to him or for his benefit, and his

attorney stated at the creditors meeting that debtor was not aware of any fraudulent transfers.

4. Debtor's schedules and statements are, at best, inaccurate. Mr. Bolotin's testimony

is, at best, inaccurate. Further investigation may reveal more misrepresentations and misconduct

by debtor and Mr. Bolotin. But the damages has been done, and debtor's games need to end.

Creditor Christopher C. Hock ("Dr. Hock") moves to convert this case for cause, including

gross mismanagement and inability to effectuate substantial consummation of a confirmed plan.

11 U.S.C. §§ 1112(b)(1), (b)(4)(B), (b)(4)(M). While conversion is in the best interest of creditors

and the estate rather than dismissal, Dr. Hock recognizes that upon a finding of cause, the court has

the authority to alternatively dismiss the case or appoint a trustee. §§ 1112(b)(1), 1185(a).

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

This motion is supported by debtor's schedules and statements (Dkt. 1, 6, 16-18); monthly operating reports (Dkt. 33, 35, 55); transcript from the creditors meeting (Dkt. 60); financial documents provided by debtor to Dr. Hock and other documents, attached as exhibits; and the declaration of Louis M. Bubala III, filed contemporaneously.

## LEGAL STANDARD

Chapter 11 subchapter v cases are subject to a motion to dismiss under Bankruptcy Code Section 1112.  *See* 11 U.S.C. § 1181.  If a party in interest establishes cause, the court shall convert the case to chapter 7, dismiss the case, or appoint a chapter 11 trustee, whichever is in the best interest of creditors and the estate.  § 1112(b)(1).  The court also shall remove the debtor from possession of the estate upon a finding of cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, before or after the filing of the case.  § 1185(a).

Even if cause exists under Section 1112, the court may deny the motion if it finds and specifically identifies unusual circumstances that conversion or dismissal is not in the best interest of creditors and the estate.  § 1112(b)(2).  For the court to so order, debtor also must establish that there is a reasonable likelihood that a plan will be confirmed under statutory periods or, if applicable a reasonable time.  § 1112(b)(2)(A).  Debtor also must establish that the cause includes an act or omission of the debtor for which exists a reasonable justification and that will be cured within a reasonable period of time fixed by the court.  § 1112(b)(2)(B).  There is no exception to removal of the debtor from possession of the estate upon a finding of cause under Section 1185(a), although the debtor may move for reinstatement under Section 1185(b).

Cause is not defined by the Bankruptcy Code, but it provides illustrative examples that are not exhaustive grounds.  *E.g., In re Products Int'l Co.*, 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).  Cause under Section 1112 includes gross mismanagement of the estate, 11 U.S.C. § 1112(b)(4)(B), and inability to effectuate substantial consummation of a confirmed plan, § 1112(b)(4)(M).  Cause

1    under Section 1185 includes fraud, dishonesty, incompetence, or gross mismanagement of the

2    affairs of the debtor.  § 1185(a).

3                        **FACTUAL & PROCEDUREAL HISTORY**

4             Debtor filed its petition on June 8, 2021.  On July 15, 2021, Mr. Bolotin testified as

5    debtor's representative at the meeting of creditors (Dkt. 60, Trans.).  Debtor has filed schedules

6    and statements (Dkt. 1), amendments (Dkt. 16-18), a pre-petition financial statement and balance

7    sheet (Dkt. 6), and operating reports for June, July and August 2021 (Dkt. 33, 35 & 55).  Debtor

8    also filed a proposed plan of reorganization (Dkt. 43) for hearing on November 3, 2021 (Dkt. 47).

9        **1. Personal Payments and Debtor's Representations**

10            **Exhibit 1** is a demonstrative exhibit that reflects the $31,511.88 in cash, wire transfers or

11   payments made for Mr. Bolotin from June 8, 2021, through August 31, 2021.  The information is

12   drawn from debtor's monthly operating reports, with the relevant pages cited for the debtor's own

13   disclosures.  During the first 85 days of the bankruptcy, debtor documented 50 payments either in

14   cash or to Mr. Bolotin.

15            The payments are not salary, according to Mr. Bolotin.  Before the bankruptcy, Mr. Bolotin

16   "never took a salary" but debtor paid "certain personal expenses for insurance and other things"

17   (Dkt. 60 at 25:8-11).  He testified that he opened his own bank account "so that now I plan on

18   being able to take a draw when its possible so that those expenses are no longer going to be the

19   responsibility of the company."  *Id.* at 25:12-16.

20            Yet debtor's financials reflect both draws for Mr. Bolotin's personal benefit AND

21   payments for his personal benefit.  When asked what expenses debtor was paying for him, he

22   stated:  "life insurance, gas expenses, some travel expenses and a few other things, but the amount

23

24

1   honestly wasn't really very much." *Id.* at 25:17-23.[1]  Mr. Bolotin estimated debtor paid between

2   $2,000 and $3,000 per month in expenses "in lieu of compensation," and that he did not take any

3   draws.  *Id.* at 26:2-11.

4          Notwithstanding his testimony, debtor's records show that debtor paid for meals and drinks

5   for Mr. Bolotin on 42 times during the first 85 days of the bankruptcy.  The company paid for

6   groceries at Raley's another 40 times during that same time period.  Debtor also made a phone

7   payment of $688.50 to Discover.  Although debtor's pre-petition balance sheet reflects a Discover

8   credit card with a balance of $1,007.09 (Dkt. 6 at 3), Mr. Bolotin testified that debtor does not

9   have any credit cards (Dkt. 60 at 27:5-6).  Discover is not scheduled as a creditor of the estate

10  (Dkt. 1, 16-18).  Finally, debtor paid $450 to the law firm Wilson Barrows Saylor for "Wild West

11  annual renewal, licenses and permit."  Wild West Mattress Co., LLC, is another entity owed by

12  Mr. Bolotin and a former chapter 7 debtor, Case No. 21-50047 (Bankr. D. Nev.).

13         During the creditors meeting, subchapter v trustee Edward Burr asked about debtor's

14  monthly operating reports and bank statements that were due in the coming days.  "That's going to

15  be very relevant to see the current status of the operation … because I know we discussed using

16  the debtor's bank account just for the debtor's expenses, limiting personal expenses, things like

17  that" (Dkt. 60 at13:8-13).  The record reflects that Mr. Burr's cautionary—yet unheeded—

18  warnings to Mr. Bolotin about personal expenditures during the initial debtor interview and the

19  creditors meeting.

20

21  [1] Dr. Hock's calculations do not include any amounts paid for gas or life insurance, two items that
    Mr. Bolotin admits are personal expenses.  The record reveals that debtor leases a truck that debtor

22  uses for deliveries, but Mr. Bolotin also use personally including driving daily from his home in
    Reno to debtor's office in Fernley (Dkt. 60 at 22:13-20).  Dr. Hock was not immediately able to

23  allocation the gasoline and other vehicle charges between a business expense and Mr. Bolotin's
    benefit.  Dr. Hock also has not included any payments made for Mr. Bolotin's life insurance.  The
    information is not readily apparent from the monthly operating reports.  However, debtor's pre-

24  petition financial statement includes $19,925.40 paid for life insurance in 2020 (Dkt. 6 at 5).

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

### 2. Unauthorized Postpetition Payments and Debtor's Representations

**Exhibit 2** is a demonstrative exhibit that reflects the $60,242.54 in unauthorized post-petition payments of pre-petition unsecured creditors from June 8, 2021, through August 31, 2021. The information is drawn from debtor's monthly operating reports, with the relevant pages cited for the debtor's own disclosures. The spreadsheet also cites additional documents provided by debtor on September 28, 2021, but not previously filed in court. The cited documents are attached as **Exhibit 3** as excerpts of the papers provided by debtor. Dr. Hock has redacted the checking account numbers and added bates numbers (Encore BK) for ease of reference.

Debtor's records reflect post-petition payments for pre-petition claims for delivery services, mattresses and furniture, radio advertising, bookkeeping, rent, taxes, and repayment of a pre-petition Paycheck Protection Loan from Elko Federal Credit Union.[1] Debtor also made post-petition payments to its sole employee and an hourly contract employee, despite testimony that debtor did not any wages or benefits on the petition date (Dkt. 60 at 9:24-10:7). Debtor did not seek court approval to pay them as critical vendors (if even allowable under *In re B&W Enters., Inc.*, 713 F.2d 534 (9th Cir. 1983) or based on a priority claim.

None of these parties identified in Exhibit 2 were scheduled as creditors (Dkt. 1, 16-18). Based on debtor's post-petition payment of their unsecured claims, they have received 100 percent repayment. In contract, Debtor's proposed plan of reorganization anticipates a payment of 1.26 percent to the scheduled unsecured creditors (Dkt. 43 at 9).

### 3. Prepetition Payments for Mr. Bolotin's Personal Benefit

**Exhibit 4** is a demonstrative exhibit that reflects $8,289.52 in payments to or for the benefit of Mr. Bolotin from June 1, 2021 through June 7, 2021, included in debtor's initial

---

[1] Mr. Bolotin testified that he did not believe debtor owed any more on the loan (Dkt. 60 at 34-35). It is impossible to tell if this was true on the petition date (June 8, 2021), at the time of the creditors meeting (July 15, 2021). Debtor did not schedule the credit union as a creditor (Dkt. 1, 16-18), and debtor made a post-petition payment of $782 to the credit union on June 16, 2021.

operating report (Dkt. 33). The payments include payments directly to Mr. Bolotin, a cash withdrawal, food and drink expenses, and a trip to Las Vegas including airfare and hotel. These conflict with debtor's statement of financial affairs, stating that no insiders have received payments from the debtor before the bankruptcy (Dkt. 1, 16-17). In response to a question about whether there were any fraudulent transfers by debtor, Mr. Darby responded that "we are not aware of any transfers out of the company that would be fraudulent or non-fraudulent" (Dkt. 60 at 33:15-17).

**4. Debtor's schedules, statement and testimony are inaccurate.**

The above references reflect a number of inconsistent or incorrect statements made by the debtor in its filing and at the creditors meeting, most particularly the failure to schedule vendors as creditors. A brief review of the creditors meeting reveals other issues.

a. Mr. Bolotin was not aware of any changes or amendments to debtor's schedules and statements since he signed the copy filed with the court (Dkt. 60 at 5:20-23).

b. He testified that debtor maintained a pre-petition bank account with Washington Federal because that is where credit card and finance payments come in, but they are timely transferred to debtor's new debtor-in-possession account with Heritage Bank. *Id.* at 12:8-20). Debtor's post-petition use of the Washington Federal account, as reflected in the monthly operating reports, is inconsistent with the testimony. Debtor routinely pays for items using the Washington Federal account.

c. Debtor "never ever" operating under any other name. However, Mr. Bolotin admitted that debtor did business as Encore Mattress Discounters, as he uses that name to market the company, uses it on commercials and uses it for the debtor's website. *Id.* at 15-17.

d. Debtor did not schedule a lease for its Fernley store, but has a month-to-month lease. *Id.* at 21.

e. Mr. Bolotin was not aware that he was a co-debtor on any of debtor's debts, and did not

KAEMPER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

schedule any co-debtors.  *See id.* at 23:3-5.  In response to follow-up question from the

U.S. Trustee's office, Mr. Darby stated that Dr. Hock's judgment is against debtor, but that

Dr. Hock's allegations against Mr. Bolotin have not been reduced to judgment (Dkt. 24:8-

26:4; see Cl. Reg. 6).

### ARGUMENT

The evidence in debtor's own records reflect cause to convert this case to chapter 7.

Debtor has engaged in gross mismanagement, as evidence by its own financial records.  Debtor

also is unable to substantially consummate a confirmed plans based on its flagrant payment of

favored vendors in full, while proposed next to nothing for the scheduled creditors.

Conversion is in the best interest of creditors and the estate.  Debtor has taken advantage of

the creditors by paying himself and his preferred creditors.  The estate also has suffered due to Mr.

Bolotin's ongoing payments to him or for his benefit.  None of these problems can be cured.

Debtor's owner and managing member is the cause of the problems.  He testified that before the

bankruptcy, he did not even have his own bank account.  There is no way to undue the payments to

and for him, or the payments he has directed to be made on pre-petition claims held by his

preferred vendors.  This leaves the scheduled creditors being treatment unfair with a plan that

projects a payment of just over a penny per dollar after give years.

### CONCLUSION

Debtor and Mr. Bolotin took advantage of debtor and the bankruptcy.  The judicial

proceeding has no effect on their actions.  There is nothing to stop this ongoing abuse if debtor is

permitted to confirm a plan that figuratively leaves creditors penniless.  The case should be

converted and a trustee appointed to investigate claims for the benefit of the estate and creditors.

Dated:  September 1, 2021          KAEMPFER CROWELL
                                    */s/  Louis M. Bubala III*
                                    Louis M. Bubala III
                                    Attorney for Christopher C. Hock

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501