1  LOUIS M. BUBALA III
   Nevada Bar No. 8974
2  KAEMPFER CROWELL
   50 W. Liberty Street, Suite 700
3  Reno, Nevada  89501
   Telephone:  (775) 852-3900
4  Facsimile:   (775) 327-2011
   Email:  lbubala@kcnvlaw.com

5
   Attorneys for Creditor Christopher Hock
6

7              **UNITED STATES BANKRUPTCY COURT**

8                    **DISTRICT OF NEVADA**

9  In re:                              Case No.:  21-50431-mkn
                                       Chapter 11, Subchapter V
10 ENCORE AUDIO VISUAL DESIGN, LLC,
                                       **NOTICE OF FILING TRANSCRIPT OF**
11         Debtor.                     **DEPOSITION OF BRAD BOLOTIN**

12                                     Deposition Date:  October 20, 2021
                                       Deposition Time:    8:00 a.m.
13

14         Attached as Exhibit 1 is the rough transcript of the deposition of Brad Bolotin taken earlier

15 today.  Litigation Services has not yet had an opportunity to finalize the transcript.  Dr. Hock will

16 file the final transcript when received from the court reporter.

17         DATED:  October 20, 2021.         KAEMPFER CROWELL

18                                           By:   /s/ Louis M. Bubala III
                                             Louis M. Bubala III
19
                                             Attorneys for Creditor Christopher C. Hock
20

21

22

23

24

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

19999.1                                                      Page 1 of 1

# EXHIBIT 1

# EXHIBIT 1

1

2

3

4

5                    UNITED STATES BANKRUPTCY COURT

6                         DISTRICT OF NEVADA

7                            ---oOo---

8

9

10

11   In Re:                        Case 21-50431-gs

12   ENCORE AUDIO VISUAL           Chapter 11, Sub V
     DESIGN, LLC,
13
            Debtor.
14
     _____
15

16                   ** ROUGH DRAFT TRANSCRIPT **

17

18                   DEPOSITION OF BRAD BOLOTIN

19                   Wednesday, October 20th, 2021

20                         ~ via Zoom ~

21

22

23

24

25   Reported by:                  KATE MURRAY, CCR #599
     Job 807144

```
 1                      APPEARANCES:

 2                    FOR THE DEBTOR:

 3              DARBY LAW PRACTICE, LTD.
                    Attorneys at Law
 4            KEVIN DARBY, ESQ. (via Zoom)
                  4777 Caughlin Parkway
 5                 Reno, Nevada 89519

 6


 7
          FOR CREDITOR CHRISTOPHER C. HOCK:
 8
                    KAEMPFER CROWELL
 9                   Attorneys at Law
            LOUIS BUBALA, ESQ. (via Zoom)
10         50 West Liberty Street, Suite 700
                   Reno, Nevada 89501
11

12

13        FOR COMSTOCK PROTECTIVE SERVICES:

14                   ESTES LAW, PC
                    Attorneys at Law
15            HOLLY ESTES, ESQ. (via Zoom)
                   605 Forest Street
16                 Reno, Nevada 89509

17

18                   ALSO PRESENT:

19          CHRISTOPHER HOCK (via Zoom)

20

21

22

23

24

25
```

3

1                              INDEX

2

3   EXAMINATION:                                    PAGE:

4   By Mr. Bubala -------------------------------   4

5   By Ms. Estes -------------------------------- 28

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              BE IT REMEMBERED that on Wednesday,

2    October 20th, 2021, at the hour of 8:09 a.m., of

3    said day, before me, KATE MURRAY, a certified court

4    reporter, remotely appeared BRAD BOLOTIN, who was by

5    me first duly sworn, and was examined as a witness

6    in said cause.

7

8                        ---oOo---

9

10                      BRAD BOLOTIN,

11      after having been duly sworn, testified as follows:

12

13                      EXAMINATION

14   BY MR. BUBALA:

15       **Q.**   Mr. Bolotin, thank you for appearing this

16   morning.  My name is Lou Bubala.  I'm an attorney

17   here in Reno.  I represent Dr. Hock.  Dr. Hock, as

18   you can see on the screen, has called in, but I will

19   be asking questions today.

20           Let me first go over a couple of ground

21   rules.  Have you ever had your deposition taken

22   before?

23       **A.**   I have.

24       **Q.**   Okay.  Do you recall the last time it was

25   taken?

5

1        **A.**    2015.

2        **Q.**    Well, hopefully, you still remember

3    things, but given that it was six years ago, I will

4    go over a couple of ground rules.

5              You have been sworn in by the court

6    reporter.  That means you are testifying under oath

7    to answer the questions to the best of your ability.

8              I will ask you questions, and if, for

9    some reason, you don't understand my question, you

10   are unclear as to what I am asking, please let me

11   know and I will try to restate the question so that

12   we have a common understanding of the question and

13   the issue that I am inquiring about.

14             Try to avoid responding with head nods,

15   with "ums" or "yeahs" or anything that might be

16   difficult for the court reporter to take down with

17   certainty, so to the best of your ability, please

18   respond with a "yes" or "no" when you are trying to

19   indicate affirmatively or negatively.

20             If, at any point, you need to take a

21   break in the deposition, please let me know and I am

22   happy to accommodate that so long as there is not a

23   question pending.

24             If there is a question pending, I will

25   need you to answer the question and then we can take

1   a break after that.

2           Is there any reason today that you would

3   not be able to answer the questions that I ask of

4   you truthfully and accurately to the best of your

5   knowledge?

6       A.   No issue.

7       Q.   Okay.  Any medical conditions that would

8   interfere in your ability to answer the questions?

9       A.   No.

10      Q.   I'm sorry.  I couldn't understand you.

11      A.   No, no issues.

12      Q.   Thank you.  Any prescriptions that would

13  interfere with your ability to answer the questions?

14      A.   No.

15      Q.   Okay.  I will begin with my questions.

16  My first question to you is, how did you meet

17  Dr. Hock?

18      A.   Dr. Hock came in to our store in Reno

19  when the store was in Reno, inquiring about

20  purchasing a system for the house he was purchasing

21  in ArrowCreek.

22      Q.   Okay.  Do you recall when that was?

23      A.   You know, honestly, I can't remember the

24  exact date.  I am going to say it was sometime in

25  2017.

7

1    **Q.**    Fair enough.

2    **A.**    To the best of my knowledge.

3    **Q.**    Understood.  Again, going back several

4    years, if there is a reason I need to ask you for a

5    more specific date, I'll ask you, but I'll also

6    understand that four years ago, nobody has perfect

7    knowledge.

8                Mr. Bolotin, did you come to any

9    agreement on an entertainment system for Dr. Hock?

10    **A.**    Yes.

11    **Q.**    Okay.  Do you recall what that agreement

12    was?

13    **A.**    It was to purchase a complete system for

14    the new house.  We agreed on the equipment and the

15    amount that he would be paying Encore to purchase

16    the system.

17    **Q.**    Did he make the payments to purchase the

18    system?

19    **A.**    He wrote checks directly to Encore AV for

20    the system, yes.  I believe there was two payments.

21    **Q.**    Was the system installed in his house?

22    **A.**    I'm sorry?

23    **Q.**    Was the system installed in his house?

24    **A.**    About 35 percent of the system was

25    installed and around 65 percent of the system was

8

1  not.

2  **Q.**   Can you tell me what -- when you say 35

3  percent, can you elaborate as to what was installed?

4  **A.**   So he had a main system off of the

5  kitchen which was his big surround sound system, but

6  we also installed televisions and audio/video in the

7  lower part of his house, which is the lower family

8  room.  That was completed.

9        We also installed televisions and

10 surround sound, sound bars in all the guest rooms

11 and his workout area.  Outside, we put the

12 weatherproof television and sound system outside.

13       The only part of the system that was not

14 fulfilled was the main surround system in the

15 upstairs family room.

16 **Q.**   And that represented the 65 percent you

17 said was not installed?

18 **A.**   Correct.

19 **Q.**   Why was that not installed?

20 **A.**   I'm sorry.  I couldn't hear your

21 question.

22 **Q.**   I apologize.  Why was the remainder not

23 installed?

24 **A.**   So at the time in which we were in the

25 midst of completing the system, the Department of

9

1    Taxation, without an administrative hearing, closed
2    Encore for almost four months.
3              We had to hire an attorney, Jesse
4    Wadhams, to represent us in an administrative
5    hearing in front of a judge to get the store to be
6    reopened.  During those times, the company had no
7    income, no revenue, nothing, and it caused us to not
8    be able to complete the system.
9              Also, we reached out, I reached out to
10   Dr. Hock, explaining what was going on.  As I came
11   to find out later, he actually recorded me without
12   my knowledge at a breakfast meeting in which, again,
13   I attempted to explain to him what happened and that
14   I would do everything I could to try to complete the
15   sale in the future.
16        Q.   Okay.  Did you make any attempts to
17   complete the transaction or complete the
18   installation?
19        A.   As I said before, we were unable
20   financially to complete the system, and we had also
21   hired another attorney in which Dr. Hock was
22   involved, and we were going to do an agreement to
23   finally get it installed, but unfortunately, we were
24   not able to financially.
25              But I, again, attempted numerous times to

1  reach out to Dr. Hock, attempting to try to resolve

2  this.  There was an e-mail that I sent to him in

3  2019 or early 2020.  Honestly, I can't remember the

4  exact date, but basically it was -- because Dr. Hock

5  and I had become friends.  We had gone out to dinner

6  with his family.

7           This was not something that I took

8  lightly, and you know, I felt terrible about it, but

9  at that time, the company was just unable to

10  complete it.

11          We attempted to go into a situation where

12  we were going to try to do it in the future, but

13  Dr. Hock chose to file lawsuits against the company

14  that required me now to pay legal fees that should

15  have gone toward finishing the system, frankly, but

16  we were not able to do that once the lawsuits were

17  filed against the company.

18      Q.   I'm going to ask you to clarify part of

19  what you said.

20          You said that funds that should have been

21  used to install the system were used to pay -- went

22  to pay lawyers.

23      A.   I didn't say the specific funds.  I said

24  that once Dr. Hock chose to file his lawsuits, the

25  company had to start paying legal fees to defend

1  ourselves.

2      **Q.**   I'm going to move on to another topic.

3  Can you identify where the debtor had bank accounts

4  prior to filing for bankruptcy?

5      **A.**   Wells Fargo, three different accounts,

6  the only place that we had the accounts.

7      **Q.**   What were the three different accounts at

8  Wells Fargo?

9      **A.**   They were just three general accounts.

10  One was typically used to pay taxes and expenses,

11  and the other ones were used to pay for inventory or

12  other things as well, so we just had three accounts.

13      **Q.**   Okay.

14      **A.**   And the accounts were all in the name of

15  the company.

16      **Q.**   Are you familiar with a bank or

17  institution called Washington Federal?

18      **A.**   Yes.

19      **Q.**   Did you, did the debtor have a

20  prepetition account with Washington Federal?

21      **A.**   We did.

22      **Q.**   What was that account for?

23      **A.**   That account was used, again, to pay for

24  inventory, wire funds to our vendors.  It was just

25  another account.

1            Since we had the store in Fernley, it
2    made sense to have an account out there instead of
3    always having to go to Wells Fargo.
4        **Q.**    I'm understanding you to imply that
5    Washington Federal has a branch in Fernley; is that
6    correct?
7        **A.**    That is correct.  In fact, it is in the
8    same shopping center as our store.
9        **Q.**    Okay.
10       **A.**    And that account is still active.  The
11   Wells Fargo accounts were closed virtually within
12   days of the filing of the bankruptcy in June.
13       **Q.**    Okay.  You opened a post-petition a
14   debtor-in-possession account afterwards; is that
15   correct?
16       **A.**    Yes, at Heritage Bank.
17       **Q.**    Okay.  Is there a distinction in how
18   Encore utilizes the Heritage account versus the
19   Washington Federal account?
20       **A.**    Both accounts are used simultaneously for
21   different -- again, it just depends on what we're
22   using it for.
23            The Washington Federal account is where
24   all of our finance companies, credit card
25   processors, the funds go into, and then we make

13

1   transfers from Washington Federal into Heritage.

2        Q.   Okay.  Did the debtor ever have an

3   account with Elko Federal Credit Union?

4        A.   Personal account with Elko Federal Credit

5   Union.

6        Q.   You, Brad Bolotin, personally had an

7   account with --

8        A.   Yes, not the company.

9        Q.   Okay.  Do you still have that account?

10       A.   The only thing that exists with Elko

11  Federal is a personal loan and a car loan for my

12  daughter's Honda Civic that I pay personally.  It is

13  not in the name of the company.

14            MR. DARBY:  I'm going to interrupt.  The

15  question was, do you still have a checking account

16  open at Elko -- listen to the question and answer

17  the question.

18            MR. BOLOTIN:  I do not have a checking

19  account any longer with Elko Federal.

20  BY MR. BUBALA:

21       Q.   Okay.  You previously had a checking

22  account with Elko Federal Credit Union?

23       A.   Yes.

24       Q.   In the motion that I filed, I identified

25  a payment that was made by the debtor to Elko

14

1  Federal Credit Union.  I saw in the response that

2  that was made in error.

3          Can you identify the purpose of that

4  payment that was made?

5      A.    That is a monthly payment paying down a

6  personal loan and the payment on my daughter's

7  vehicle.

8      Q.    Okay.  During the creditors meeting which

9  was conducted before the Office of the US Trustee, I

10 believe, John Sande participated in that for

11 Dr. Hock, I believe you testified that you had a --

12 you, the debtor, had a PPP loan from Elko Federal

13 Credit Union.

14         Do you recall that, or if I accurately

15 stated that?

16     A.    They were the middleman for the PPP loan.

17 The loan was actually made through a banking

18 relationship that they had with a bank in Utah, but

19 yes, they administered getting us the PPP loan.

20     Q.    What was the bank in Utah?

21     A.    Honestly, I do not know the name of the

22 bank.

23     Q.    When you say the middleman, tell me what

24 you mean by the middleman?

25     A.    We went to Elko Federal for the PPP loan.

1  We filled out all the paperwork, but the loan was

2  administered by them with a bank that they have a

3  relationship with in Utah, and the funds did come in

4  to Elko Federal, and then those funds were wired

5  into our Wells Fargo account at that time, as I

6  remember.

7       Q.   My recollection is that you testified at

8  the creditors meeting that someone at Elko Federal

9  Credit Union said -- had orally told you that the

10 loan had been forgiven?

11      A.   That's correct.

12      Q.   Did you ever receive any documentation

13 regarding that?

14      A.   There are some e-mails probably for that

15 but, not anything in writing like in a letter, no.

16      Q.   Okay.  Do you recall who your point of

17 contact was with Elko Federal Credit Union?

18      A.   I really don't, off the top of my head.

19 I'm sorry.

20      Q.   Is there a person at the bank you

21 communicate with based on your personal

22 relationships with the credit union?

23      A.   Well, you know, off the top of my head, I

24 cannot think of that person's name.  If I can

25 remember it before we finish, I will be glad to

1    provide it to you.

2        Q.    Okay.  Do you recall how much money you

3    received in the PPP loan?

4        A.    I believe it was $10,000.

5        Q.    Has the debtor -- did the debtor repay

6    any of that?

7        A.    No.

8        Q.    Does the debtor pay for insurance?

9        A.    I'm sorry.  I couldn't hear the question.

10       Q.    Does the debtor pay for any insurance?

11       A.    Yes.

12       Q.    What types of insurance does it pay for?

13       A.    The company has been paying for my health

14   insurance and life insurance, and that was in lieu

15   of getting payroll.

16                  (Break taken at 8:27 a.m.)

17   BY MR. BUBALA:

18       Q.    We're back on.  Before we took the

19   break -- well, first of all, Mr. Bolotin, can you

20   hear me better?

21       A.    I can.

22       Q.    Great.  Again, if there is difficulty

23   with my audio, please let me know, and again, we'll

24   try to figure out a better solution.

25                  Before we took a break, you indicated

1  that the firm pays for health insurance and life
2  insurance for you; is that correct?
3          A.   Correct.
4          Q.   Who is the health insurance with?
5          A.   Well, it's with -- I'm on, you know --
6  I'm on -- what is it?  Social Security.
7               MR. DARBY:  Medicare?
8               MR. BOLOTIN:  I'm on Medicare, so it's
9  with United Healthcare.
10 BY MR. BUBALA:
11         Q.   Okay.  And the life insurance, who is
12 that with?
13         A.   That is with Principal Financial.
14         Q.   How much is the life insurance?  Do you
15 know the benefit of the life insurance?
16         A.   The amount?
17         Q.   Yes.
18         A.   $800,000.
19         Q.   Is that a term policy or whole life
20 policy?
21         A.   Life.
22         Q.   When I say whole life, I mean such that
23 you have equity in that policy.  Do you understand
24 that?
25         A.   Correct.

18

1          **Q.**    Who is the owner of the policy?

2          **A.**    I am.

3          **Q.**    When you say, "I am," do you mean you

4     personally?

5          **A.**    Me personally, yes.

6          **Q.**    Who is the beneficiary of that policy?

7          **A.**    The beneficiary is -- there are -- my

8     wife, Kathleen, is the beneficiary.

9          **Q.**    Do you know how much you pay in annual

10    premiums in that policy or how much the debtor pays?

11         **A.**    I believe it's now 740, I don't know the

12    exact amount, Lou, but 700 plus a month.

13         **Q.**    Did you say a month?

14         **A.**    A month.

15         **Q.**    Are you familiar with the firm Wilson

16    Barrows?

17         **A.**    Yes.

18         **Q.**    What is that the debtor's relationship

19    with Wilson Barrows?

20         **A.**    They're the lawyer on record for Encore

21    through the Secretary of State.  They're my lawyer

22    for the company from the standpoint of our setup

23    with the State as whatever they call them, whatever

24    they call it.  That is all we have, a relationship

25    with them at this time.

1      **Q.**   Okay.  Are you familiar with the company

2   Wild West Mattress?

3      **A.**   Yes.

4      **Q.**   What is that company?

5      **A.**   That is a company that I own that Wilson

6   Barrows also is in charge of with the Secretary of

7   State for our annual.

8      **Q.**   Okay.  Do you recall in my motion I

9   raised a concern about a payment to Wilson Barrows?

10     **A.**   Yes.

11     **Q.**   I believe in your response you indicated

12   that was a payment for Encore's corporate filings?

13     **A.**   Correct.

14     **Q.**   What did you do to determine that that

15   was a payment for Encore's corporate filings?

16     **A.**   I received the request for payment from

17   Wilson Barrows to make the payment so that they

18   could go ahead and file the required paperwork.

19     **Q.**   Between the time that I filed my motion

20   and the time you filed your response, did you review

21   that paperwork that you received from Wilson

22   Barrows?

23     **A.**   Yes.

24     **Q.**   If you recall in my motion, I cited to

25   your monthly operating reports.  My recollection is

20

1   that that was identified as a payment for Wild West

2   corporate filings.  Can you identify why it was

3   identified as such?

4        **A.**   I honestly have no idea.  If Encore ended

5   up paying for that, that was in error, but I can

6   tell you now, emphatically, that is being paid by me

7   personally.

8        **Q.**   In evaluating -- let me restart that.

9            Are you familiar with a term called a

10  preference payment?

11       **A.**   Yes.

12       **Q.**   What does that mean to you?

13       **A.**   It means that you pay something ahead of

14  something else, so somebody gets the benefit of that

15  payment over somebody else.  Is that correct?

16       **Q.**   I think that is an accurate statement.

17       **A.**   Okay.

18       **Q.**   I will add if you disagree, please let me

19  know, that in the terms of a bankruptcy, preferences

20  for entities not affiliated with the debtor, there

21  is a 90-day lookback period before the bankruptcy is

22  filed to evaluate those payments for preferences.

23            Is that a concept you're familiar with?

24       **A.**   Yes.

25       **Q.**   Can you tell me what you did in terms of

21

1  evaluating whether or not there were any preference
2  payments made in the 90 days before Encore filed for
3  bankruptcy?

4       **A.**    You mean specifically?  I can't tell you
5  exactly what those payments were.

6       **Q.**    But did you do any investigation or
7  inquiry to determine whether or not any preference
8  payments were made?

9       **A.**    I did not.

10      **Q.**    Did you review any of the financials in
11 the year before the bankruptcy to determine whether
12 or not any payments should be returned?

13      **A.**    No.

14      **Q.**    In the financial reports you filed with
15 the Court, it appears that there were some refunds
16 issued for customers.  Did I read the monthly
17 operating reports correctly?

18      **A.**    There were a couple of refunds, yes.

19      **Q.**    Okay.  Do you recall if those refunds
20 were made for purchases made before or after the
21 bankruptcy?

22      **A.**    The payments were for -- well, I don't
23 know which one -- are you asking me about a specific
24 one?

25      **Q.**    I'm just asking what you recall.

1          **A.**    I don't remember.

2          **Q.**    Do you know an individual named Chris,

3     and I may mispronounce this, Aramini?

4          **A.**    Chris Aramini.  Yes, Chris Aramini is an

5     employee of Lee Brothers Leasing.

6          **Q.**    Okay.  What is your relationship with

7     Mr. Aramini?

8          **A.**    We have a professional relationship.  We

9     lease our vehicles there.  They provided inventory

10    leasing for the company in the past.

11         **Q.**    Okay.  In your monthly operating reports,

12    there were payments made directly to Mr. Aramini.

13    Do you recall those?

14         **A.**    There were -- there was a time when there

15    was -- he did make some loans directly to the

16    company, yes.

17         **Q.**    Do you recall when he made a loan to the

18    company?

19         **A.**    I do not know the date.  I do not know

20    the dates.

21         **Q.**    Was it before or after you filed for

22    bankruptcy?

23         **A.**    It would have been before.

24         **Q.**    Do you recall how much he loaned the

25    company?

23

1        **A.**    Somewhere around $10,000.

2        **Q.**    Has he been paid in full?

3        **A.**    He has.

4        **Q.**    Okay.  Was there a written agreement for

5    that loan?

6        **A.**    No.

7        **Q.**    What was the purpose of the loan?

8        **A.**    To purchase inventory for Encore.

9        **Q.**    When you say inventory, can you be more

10   specific?

11       **A.**    Yeah.  He loaned the company money, which

12   the money went directly into the company's accounts

13   because he always used a credit card as a way of

14   providing the funds, and we used it to purchase

15   furniture, mattresses, and audio/video.

16       **Q.**    Did Mr. Aramini have a security interest?

17   Was the loan collateralized in any way?

18       **A.**    It was not.

19       **Q.**    Was there any interest owed on that loan?

20       **A.**    Yes.

21       **Q.**    Do you recall what interest rate you were

22   being charged?

23       **A.**    I do not know the exact amount.

24       **Q.**    Do you have any idea how much interest

25   you paid on that loan?

1          **A.**    I believe it was less than $1,000.

2          **Q.**    Do you recall when that loan was paid

3     off?

4          **A.**    I do not know the exact date.

5          **Q.**    Was it -- do you know if it was paid off

6     before or after Encore filed for bankruptcy?

7          **A.**    It was before.

8          **Q.**    If there are checks written to

9     Mr. Aramini after the bankruptcy was filed, do you

10    know what those checks were for?

11         **A.**    They would have been used -- well,

12    personally, or Lee Brothers or Bros Leasing?

13         **Q.**    To Mr. Aramini personally?

14         **A.**    That it was paid afterwards?  If it was

15    paid afterwards, it was for that loan.

16         **Q.**    Okay.

17         **A.**    I'm not aware that I did, but maybe I

18    did.  Like I said, I don't remember exactly.

19         **Q.**    Okay.  A clarification, I believe you

20    said Mr. Aramini made loans in a plural sense to the

21    company.  Do you recall if he made more than one

22    loan to the company.

23         **A.**    Absolutely, but none within that 90-day

24    period that you are speaking of, other than the one

25    we're discussing right now.

25

1      **Q.**   Okay.  Can you identify what prior loans

2  he had made to the company?

3      **A.**   I cannot give you that answer.  Sorry.

4      **Q.**   Do you recall how much money you borrowed

5  from him in previous loans?

6      **A.**   There were probably three or four

7  different loans around the same $10,000 amount from

8  2018 through 2021.

9      **Q.**   Were there written agreements for any of

10  those loans?

11      **A.**   There were not.

12      **Q.**   Were those previous loans repaid?

13      **A.**   Yes.

14      **Q.**   Do you recall the interest rate on any of

15  those previous loans?

16      **A.**   I don't know the exact amount.

17      **Q.**   Do you recall how much interest you paid

18  on the previous loans?

19      **A.**   I do not.

20      **Q.**   Were those loans subject to a security

21  agreement or any collateral?

22      **A.**   There was not.

23      **Q.**   Can you tell me how you came to borrow

24  money from Mr. Aramini personally?

25      **A.**   Because of our relationship at Lee

1   Brothers, there were times when -- they loan money

2   to their clients.  That is something that he has

3   done not just for me, but for many people that he

4   has a relationship with.  I wasn't the only one.

5           Because of our relationship that goes

6   back 20 years with Lee Brothers, I asked him

7   numerous time if there was a possibility that he

8   could loan money to the company that I could use to

9   purchase inventory on a short-term basis and repay

10  it, which I did in full.

11      Q.   Does Wild West Mattress have any

12  operations at this point?

13      A.   No.

14      Q.   Does it have any assets at this point?

15      A.   No.

16      Q.   Other than Encore, do you work for anyone

17  else?

18      A.   I'm sorry, Lou.  I couldn't hear you.

19      Q.   Yes.  Other than Encore, do you, Brad

20  Bolotin, personally work for anyone else?

21      A.   No.

22      Q.   Do you receive compensation for anyone

23  other than Encore?

24      A.   No.

25      Q.   Do you have a source of income other than

1   Encore?

2        **A.**   Yes.

3        **Q.**   What is that source of income?

4        **A.**   My wife's income from her real estate

5   business, which over the last few years while Encore

6   was reestablishing itself after COVID, she has been

7   supporting the family for the last three years.

8        **Q.**   Do you recall the declaration that you

9   filed in conjunction with the response to my motion?

10  I believe you testified you had repaid certain funds

11  to the debtor.

12       **A.**   I'm sorry.  I don't understand the

13  question.

14       **Q.**   I understood your declaration to state

15  that you had made personal payments back to Encore

16  to resolve any disputed payments that you received

17  previously?

18       **A.**   That is correct.  I made payments in

19  August and October.

20       **Q.**   I believe the combined amount was

21  approximately $4,500?

22       **A.**   That is correct.

23       **Q.**   Okay.  What was the source of those funds

24  that you repaid?

25       **A.**   So after -- before -- the one that was

1  paid in August was I took a draw and turned right

2  back around and reimbursed the company with it.

3        The other two payments were also

4  basically the same, so as I received the money from

5  the company that was owed to me as part of my

6  salary, I chose to repay it back.

7        Since I have income from my wife for our

8  family expenses, I was able to clear up those

9  expenses to make sure that there wasn't any

10 misunderstanding that those funds needed to be paid

11 back.

12       MR. BUBALA:  I don't believe I have any

13 other questions.  I know Ms. Estes is on the line,

14 and she indicated she may have some questions for

15 you.  She has joined in the motion, to I will defer

16 to Ms. Estes.

17       MS. ESTES:  Good morning, Mr. Bolotin.

18 My name is Holly Estes.  I represent Comstock --

19 excuse me.  Just one moment.

20       I'm just going to look at my notes really

21 quick, but I do have a few questions for you.

22       MR. BOLOTIN:  Sure.

23                    EXAMINATION

24 BY MS. ESTES:

25       Q.   Mr. Bolotin, you understand you're still

1  sworn in?

2       **A.**   I do.

3       **Q.**   Okay.  Again, my name is Holly Estes.  I

4  represent Comstock Protective Services, LLC, and I

5  just have a few questions.

6              I believe at the 341 meeting of

7  creditors, my recollection was that you said you did

8  not have a personal bank account at that time; is

9  that correct?

10      **A.**   That is correct.

11      **Q.**   And then this morning, there was a

12  discussion that you had a checking account with Elko

13  Federal; is that correct?

14      **A.**   I haven't had a checking account with

15  Elko Federal for like two or three years.

16      **Q.**   Sure.  That is my next question.  When

17  did that checking account get closed with Elko

18  Federal?

19      **A.**   We had a store out in Elko, which is, by

20  the way, one of the reasons that we had the account

21  out there.  The account has been closed since, I

22  would say 2018, if I'm even close.

23              The only thing we have is a -- I have a

24  loan, a monthly payment.  That is all I have with

25  Elko Federal.

1    **Q.**    The loan and the car payment for your
2    daughter's Honda?
3    **A.**    It's a combined loan.
4    **Q.**    Oh, I see.
5    **A.**    They consolidated it.
6    **Q.**    I see.  Uh-huh.  Then with regard to your
7    health insurance, I believe your testimony this
8    morning was that you had a new health insurance, and
9    it was through United Healthcare; is that correct?
10    **A.**    Well, since -- well, I'm 68 years old, so
11    from the time I was 65 to current is when I was with
12    United Healthcare through Medicare.
13    **Q.**    Okay.  So for the last three years, would
14    you say?
15    **A.**    Yes, yes.
16    **Q.**    Okay.  What is the monthly health
17    insurance payment?
18    **A.**    Well, there is, you know, there's A,
19    there's B, there's C.  I'm going to say the combined
20    amount is somewhere between $500 and $700.  I don't
21    even think it's that much.
22    **Q.**    That is the monthly payment amount?
23    **A.**    It is.
24    **Q.**    Uh-huh.  With regard to Chris Aramini --
25    am I saying his name correctly?

31

1      **A.**   Yes.

2      **Q.**   Is that the person who you have dealt

3    with when you lease vehicles through Lee Brothers?

4      **A.**   Yes.  Well, they have two companies.

5    They have Bros Leasing, and they have Lee Brothers.

6            Lee Brothers was taken over by the Dolan

7    Group, but in the past, Bros Leasing was owned by

8    Chris, his brother, and the original owner of Lee

9    Brothers, Michael Lee, and so those continue to

10   operate simultaneously out of the same office over

11   where Lee Brothers has their showroom.

12     **Q.**   Okay.  Chris was the owner of that

13   company; is that what I understand?

14     **A.**   He was never owner of Lee Brothers.  He

15   was general manager.  It was owned by Michael Lee

16   until Dolan purchased it.

17           Bros Leasing is owned by and still owned

18   by John Aramini, Chris Aramini, and Michael Lee.

19     **Q.**   And you leased the vehicles through Bros

20   Leasing or Lee Brothers?

21     **A.**   The vehicle leasing is through Lee

22   Brothers and the inventory financing was done

23   through Bros Leasing, and that was also where the

24   payments went back to.

25           When the money was loaned to me from

32

1   Chris, the money came out of Bros Leasing.  Now,

2   what he did with it after we made the repayment, I

3   have no idea.

4         **Q.**   So the relationship between yourself or

5   the debtor and Bros Leasing is that loans were made

6   from Bros Leasing to the debtor for inventory?

7         **A.**   Correct.

8         **Q.**   Chris is the owner or an owner of Bros

9   Leasing?

10        **A.**   Yes.

11        **Q.**   I know you testified you didn't know when

12  the other loans were made, but you did testify other

13  loans had been made.  Were those other loans made by

14  Bros Leasing?

15        **A.**   Some were made by Bros and some were made

16  by Chris personally.

17        **Q.**   Uh-huh.  Do you know the time period of

18  when those loans were made?

19        **A.**   Not off the top of my head, but what I

20  can tell you is they were way before 90 days before

21  the filing.

22        **Q.**   Okay.  Are they 180 days before the

23  filing?

24        **A.**   I don't remember that, and I don't know,

25  is that relevant?

1          MR. DARBY:  Brad, just answer the

2    questions.  Don't ask questions.

3          MR. BOLOTIN:  I can't tell you the exact

4    amount of when, the dates of those, but they were a

5    while ago, other than the one that I testified to

6    earlier when Lou asked me the question.

7    BY MS. ESTES:

8      Q.   Uh-huh.  Were there any loans that were

9    made within nine months of the filing?

10     A.   I don't recall.

11     Q.   Within one year?

12     A.   You know, again, I can't tell you the

13   exact date off the top of my head.  I'm sorry, and I

14   don't want to guess.

15     Q.   Within two years?

16          MR. DARBY:  Holly, he explained this to

17   you.  He is not going to answer this question.

18          Are we going to ask about three, four,

19   five, six, and seven?  He just told you he doesn't

20   know.  He is not going to continue to answer every

21   theoretical time period you can come up with.

22          MS. ESTES:  Well, I am just trying to get

23   a sense of when the loans were made, Kevin.

24   Sometimes, when you ask these types of questions,

25   the deponent can say, Oh, gosh, it was at least

1  three years back.

2  BY MS. ESTES:

3      **Q.**   With regard to the prior loans, was there

4  any documentation related to those loans?

5      **A.**   I believe I answered that question when

6  Lou asked me.  The answer is no.

7      **Q.**   Okay.  But always, the money was

8  deposited into a bank account for the business?

9      **A.**   Correct.

10     **Q.**   Which bank account would that money have

11  been deposited in?

12     **A.**   Wells Fargo.

13     **Q.**   Into the Wells Fargo account, okay.

14          How is the decision made about who would

15  loan the money, whether it would come from Bros

16  Leasing, or from Chris Aramini?

17     **A.**   I have no idea.  If I went to Chris,

18  Chris would decide who would make it, him personally

19  on a credit card, or whether it would be through

20  Bros Leasing.

21     **Q.**   Uh-huh.  And how long have you known

22  Chris?

23     **A.**   Twenty plus years.

24     **Q.**   And when you first met twenty plus years

25  ago, how did you come to know him?

```
1          A.    Leasing vehicles from Lee Brothers.  At
2     that point in time, we were just a client.
3          Q.    I see.
4          A.    And that goes all the way back to my
5     previous company, Wild West Electronics.
6          Q.    Uh-huh.  You had a consistent
7     relationship with him over that 20 years?
8          A.    Yes.
9               MR. DARBY:  Is that a question or a
10    statement?
11              MR. BOLOTIN:  Yeah.  Is that a question
12    or a statement?
13    BY MS. ESTES:
14         Q.    No.  I was asking you a question.  Have
15    you had a relationship with him over the last 20
16    years consistently?
17         A.    Yes.
18         Q.    And with regard to this loan for
19    approximately $10,000, what was the repayment term
20    of that loan?
21         A.    Pay it back as soon as you can, and he
22    charged me a small amount of interest.
23         Q.    And the interest was just for $1,000?
24    There was no -- was there a percentage interest rate
25    or an agreed amount for interest?
```

1        A.   When was the loan was ready to be paid
2   off, he would provide me with what the interest
3   amount, which -- like I said, I know it was less
4   than $1,000 on the $10,000.
5        Q.   So it was just upon repayment that you
6   find out what the interest rate is?
7        A.   Most of the loans were short-term, so 90
8   days, 60 days, 120 days.  Again, I wish I could be
9   more specific, but I cannot.
10        Q.   Uh-huh.  Is that your testimony, that the
11   prior loans, the repayment term -- what were the
12   repayment terms for the prior loans?
13        A.   There wasn't really -- he would loan the
14   money to the company and expect to get paid back
15   within a reasonable period of time.
16             MR. DARBY:  Holly, I'm going to have to
17   ask, almost all these questions were asked by Lou,
18   and we're not going to ask the same questions over
19   and over in hopes of catching a witness in a trap.
20             We're coming to the point where I'm going
21   to advise him not to answer questions that have all
22   been asked and answered.  These have all been
23   answered.
24             MS. ESTES:  Well, they haven't, Kevin.
25   I'm just trying to get a little bit more specific.

```
1              MR. DARBY:  We don't need to argue.  Just
2    go to your next question.  Go to your next question.
3              MS. ESTES:  Uh-huh.
4              MR. DARBY:  Uh-huh.
5              MS. ESTES:  I don't think I have any
6    other questions at this time.
7              MR. DARBY:  Can we have one moment to go
8    off the record real quick?  I need to ask my client
9    something.
10             MS. ESTES:  Sure.
11                 (Break taken at 9:07 a.m.)
12             MR. DARBY:  Lou, do you have any
13   follow-up questions?
14             MR. BUBALA:  I do not.  Any rebuttal?
15             MR. DARBY:  No, not at this time.
16             (Deposition concluded at 9:08 a.m.)
17
18
19
20
21
22
23
24
25
```