LOUIS M. BUBALA III
Nevada Bar No. 8974
KAEMPFER CROWELL
50 W. Liberty Street, Suite 700
Reno, Nevada 89501
Telephone: (775) 852-3900
Facsimile: (775) 327-2011
Email: lbubala@kcnvlaw.com

Attorneys for Creditor Christopher Hock

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ENCORE AUDIO VISUAL DESIGN, LLC,<br><br>Debtor. | Case No.: 21-50431-mkn<br>Chapter 11, Subchapter V<br><br>**AMENDED**<br>**NOTICE OF FILING TRANSCRIPT OF DEPOSITION OF BRAD BOLOTIN**<br><br>Deposition Date: October 20, 2021<br>Deposition Time: 8:00 a.m. |

Attached as Exhibit 1 is the final transcript of the deposition of Brad Bolotin taken October 20, 2021. The draft transcript was originally filed on October 20, 2021 (Dkt. 89). The transcript appears to still be subject to any errata from Mr. Bolotin. Prior citations to the draft transcript remain substantially the same as the final transcript, with the citation off by by what appears to be 1 line at times based on an initial comparison of the draft and final transcripts.

DATED: October 25, 2021.

KAEMPFER CROWELL

By: _/s/ Louis M. Bubala III_
Louis M. Bubala III

Attorneys for Creditor Christopher C. Hock

# EXHIBIT 1

# EXHIBIT 1

```
 1

 2

 3

 4

 5                 UNITED STATES BANKRUPTCY COURT

 6                      DISTRICT OF NEVADA

 7                         ---oOo---

 8

 9

10

11    In Re:                        Case 21-50431-mkn

12    ENCORE AUDIO VISUAL           Chapter 11, Sub V
      DESIGN, LLC,
13
              Debtor.
14
      _____
15

16

17

18              DEPOSITION OF BRAD BOLOTIN

19            Wednesday, October 20th, 2021

20                   ~ via Zoom ~

21

22

23

24

25    Reported by:                 KATE MURRAY, CCR #599
      Job No. 807144
```

Page 2

```
 1              APPEARANCES:

 2              FOR THE DEBTOR:

 3          DARBY LAW PRACTICE, LTD.
                Attorneys at Law
 4       KEVIN DARBY, ESQ. (via Zoom)
              4777 Caughlin Parkway
 5            Reno, Nevada 89519

 6

 7
     FOR CREDITOR CHRISTOPHER C. HOCK:
 8
                 KAEMPFER CROWELL
 9              Attorneys at Law
        LOUIS BUBALA, ESQ. (via Zoom)
10   50 West Liberty Street, Suite 700
               Reno, Nevada 89501
11

12

13   FOR COMSTOCK PROTECTIVE SERVICES:

14               ESTES LAW, PC
                Attorneys at Law
15       HOLLY ESTES, ESQ. (via Zoom)
                605 Forest Street
16            Reno, Nevada 89509

17

18
                 ALSO PRESENT:
19
         CHRISTOPHER HOCK (via Zoom)
20

21

22

23

24

25
```

BRAD BOLOTIN - 10/20/2021

```
                                                        Page 3
 1                          INDEX

 2

 3   EXAMINATION:                                    PAGE:

 4   By Mr. Bubala -------------------------------  4

 5   By Ms. Estes ------------------------------- 29

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

BRAD BOLOTIN - 10/20/2021

Page 4

```
1              BE IT REMEMBERED that on Wednesday,
2    October 20th, 2021, at the hour of 8:09 a.m., of
3    said day, before me, KATE MURRAY, a certified court
4    reporter, remotely appeared BRAD BOLOTIN, who was by
5    me first duly sworn, and was examined as a witness
6    in said cause.
7
8                        ---oOo---
9
10                      BRAD BOLOTIN,
11    after having been duly sworn, testified as follows:
12
13                      EXAMINATION
14   BY MR. BUBALA:
15        Q.   Mr. Blot, thank you for appearing this
16   morning.  My name is Lou Bubala.  I'm an attorney
17   here in Reno.  I represent Dr. Hock.  Dr. Hock, as
18   you can see on the screen, has called in, but I will
19   be asking questions today.
20              Let me first go over a couple of ground
21   rules.  Have you ever had your deposition taken
22   before?
23        A.   I have.
24        Q.   Okay.  Do you recall the last time it was
25   taken?
```

BRAD BOLOTIN - 10/20/2021

1        A.   2015.

2        Q.   Well, hopefully, you still remember

3   things, but given that it was six years ago, I will

4   go over a couple of ground rules.

5             You have been sworn in by the court

6   reporter.  That means you are testifying under oath

7   to answer the questions to the best of your ability.

8             I will ask you questions, and if, for

9   some reason, you don't understand my question, you

10   are unclear as to what I am asking, please let me

11   know and I will try to restate the question so that

12   we have a common understanding of the question and

13   the issue that I am inquiring about.

14             Try to avoid responding with head nods,

15   with "ums" or "yeahs" or anything that might be

16   difficult for the court reporter to take down with

17   certainty, so to the best of your ability, please

18   respond with a "yes" or "no" when you are trying to

19   indicate affirmatively or negatively.

20             If, at any point, you need to take a

21   break in the deposition, please let me know and I am

22   happy to accommodate that so long as there is not a

23   question pending.

24             If there is a question pending, I will

25   need you to answer the question and then we can take

Page 6

1    a break after that.

2              Is there any reason today that you would

3    not be able to answer the questions that I ask of

4    you truthfully and accurately to the best of your

5    knowledge?

6         A.   No issue.

7         Q.   Okay.  Any medical conditions that would

8    interfere in your ability to answer the questions?

9         A.   No.

10        Q.   I'm sorry.  I couldn't understand you.

11        A.   No, no issues.

12        Q.   Thank you.  Any prescriptions that would

13   interfere with your ability to answer the questions?

14        A.   No.

15        Q.   Okay.  I will begin with my questions.

16   My first question to you is, how did you meet

17   Dr. Hock?

18        A.   Dr. Hock came in to our store in Reno

19   when the store was in Reno, inquiring about

20   purchasing a system for the house he was purchasing

21   in ArrowCreek.

22        Q.   Okay.  Do you recall when that was?

23        A.   You know, honestly, I can't remember the

24   exact date.  I am going to say it was sometime in

25   2017.

Page 7

```
 1          Q.   Fair enough.

 2          A.   To the best of my knowledge.

 3          Q.   Understood.  Again, going back several

 4   years, if there is a reason I need to ask you for a

 5   more specific date, I'll ask you, but I also

 6   understand that four years ago, nobody has perfect

 7   knowledge.

 8               Mr. Bolotin, did you come to any

 9   agreement on an entertainment system for Dr. Hock?

10          A.   Yes.

11          Q.   Okay.  Do you recall what that agreement

12   was?

13          A.   It was to purchase a complete system for

14   the new house.  We agreed on the equipment and the

15   amount that he would be paying Encore to purchase

16   the system.

17          Q.   Did he make the payments to purchase the

18   system?

19          A.   He wrote checks directly to Encore AV for

20   the system, yes.  I believe there was two payments.

21          Q.   Was the system installed in his house?

22          A.   I'm sorry?

23          Q.   Was the system installed in his house?

24          A.   About 35 percent of the system was

25   installed and around 65 percent of the system was
```

BRAD BOLOTIN - 10/20/2021

Page 8

1    not.

2        Q.   Can you tell me what -- when you say 35

3    percent, can you elaborate as to what was installed?

4        A.   So he had a main system off of the

5    kitchen which was his big surround sound system, but

6    we also installed televisions and audio/video in the

7    lower part of his house, which is the lower family

8    room.  That was completed.

9             We also installed televisions and

10   surround sound, sound bars in all the guest rooms

11   and his workout area.  Outside, we put the

12   weatherproof television and sound system outside.

13            The only part of the system that was not

14   fulfilled was the main surround sound system in the

15   upstairs family room.

16       Q.   And that represented the 65 percent you

17   said was not installed?

18       A.   Correct.

19       Q.   Why was that not installed?

20       A.   I'm sorry.  I couldn't hear your

21   question.

22       Q.   I apologize.  Why was the remainder not

23   installed?

24       A.   So at the time in which we were in the

25   midst of completing the system, the Department of

BRAD BOLOTIN - 10/20/2021

Page 9

1   Taxation, without an administrative hearing, closed

2   Encore for almost four months.

3           We had to hire an attorney, Jesse

4   Wadhams, to represent us in an administrative

5   hearing in front of a judge to get the store to be

6   reopened.  During those times, the company had no

7   income, no revenue, nothing, and it caused us to not

8   be able to complete the system.

9           Also, we reached out, I reached out to

10  Dr. Hock, explaining what was going on.  As I came

11  to find out later, he actually recorded me without

12  my knowledge at a breakfast meeting in which, again,

13  I attempted to explain to him what happened and that

14  I would do everything I could to try to complete the

15  sale in the future.

16      **Q.   Okay.  Did you make any attempts to**

17  **complete the transaction or complete the**

18  **installation?**

19      A.   As I said before, we were unable

20  financially to complete the system, and we had also

21  hired another attorney in which Dr. Hock was

22  involved, and we were going to do an agreement to

23  finally get it installed, but unfortunately, we were

24  not able to, financially.

25          But I, again, attempted numerous times to

BRAD BOLOTIN - 10/20/2021

Page 10

1   reach out to Dr. Hock, attempting to try to resolve

2   this.  There was an e-mail that I sent to him in

3   2019 or early 2020.  Honestly, I can't remember the

4   exact date, but basically it was -- because Dr. Hock

5   and I had become friends.  We had gone out to dinner

6   with his family.

7           This was not something that I took

8   lightly, and you know, I felt terrible about it, but

9   at that time, the company was just unable to

10  complete it.

11          We attempted to go into a situation where

12  we were going to try to do it in the future, but

13  Dr. Hock chose to file lawsuits against the company

14  that required me now to pay legal fees that should

15  have gone toward finishing the system, frankly, but

16  we were not able to do that once the lawsuits were

17  filed against the company.

18      Q.   I'm going to ask you to clarify part of

19  what you said.

20          You said that funds that should have been

21  used to install the system were used to pay -- went

22  to pay lawyers.

23      A.   I didn't say the specific funds.  I said

24  that once Dr. Hock chose to file his lawsuits, the

25  company had to start paying legal fees to defend

Page 11

1   ourselves.

2        Q.   I'm going to move on to another topic.

3   Can you identify where the debtor had bank accounts

4   prior to filing for bankruptcy?

5        A.   Wells Fargo, three different accounts,

6   the only place that we had the accounts.

7        Q.   What were the three different accounts at

8   Wells Fargo?

9        A.   They were just three general accounts.

10  One was typically used to pay taxes and expenses,

11  and the other ones were used to pay for inventory or

12  other things as well, so we just had three accounts.

13       Q.   Okay.

14       A.   And the accounts were all in the name of

15  the company.

16       Q.   Are you familiar with a bank or

17  institution called Washington Federal?

18       A.   Yes.

19       Q.   Did you, did the debtor have a

20  prepetition account with Washington Federal?

21       A.   We did.

22       Q.   What was that account for?

23       A.   That account was used, again, to pay for

24  inventory, wire funds to our vendors.  It was just

25  another account.

BRAD BOLOTIN - 10/20/2021

Page 12

```
 1              Since we had the store in Fernley, it
 2  made sense to have an account out there instead of
 3  always having to go to Wells Fargo.
 4        Q.   I'm understanding you to imply that
 5  Washington Federal has a branch in Fernley; is that
 6  correct?
 7        A.   That is correct.  In fact, it is in the
 8  same shopping center as our store.
 9        Q.   Okay.
10        A.   And that account is still active.  The
11  Wells Fargo accounts were closed virtually within
12  days of the filing of the bankruptcy in June.
13        Q.   Okay.  You opened post-petition a
14  debtor-in-possession account afterwards; is that
15  correct?
16        A.   Yes, at Heritage Bank.
17        Q.   Okay.  Is there a distinction in how
18  Encore utilizes the Heritage account versus the
19  Washington Federal account?
20        A.   Both accounts are used simultaneously for
21  different -- again, it just depends on what we're
22  using it for.
23              The Washington Federal account is where
24  all of our finance companies, credit card
25  processors, the funds go into, and then we make
```

BRAD BOLOTIN - 10/20/2021

Page 13

1    transfers from Washington Federal into Heritage.

2        Q.   Okay.  Did the debtor ever have an

3    account with Elko Federal Credit Union?

4        A.   Personal account with Elko Federal Credit

5    Union.

6        Q.   You, Brad blot, personally had an account

7    with --

8        A.   Yes, not the company.

9        Q.   Okay.  Do you still have that account?

10       A.   The only thing that exists with Elko

11   Federal is a personal loan and a car loan for my

12   daughter's Honda Civic that I pay personally.  It is

13   not in the name of the company.

14            MR. DARBY:  I'm going to interrupt.  The

15   question was, do you still have a checking account

16   open at Elko -- listen to the question and answer

17   the question.

18            MR. BOLOTIN:  I do not have a checking

19   account any longer with Elko Federal.

20   BY MR. BUBALA:

21       Q.   Okay.  You previously had a checking

22   account with Elko Federal Credit Union?

23       A.   Yes.

24       Q.   In the motion that I filed, I identified

25   a payment that was made by the debtor to Elko

BRAD BOLOTIN - 10/20/2021

Page 14

1    Federal Credit Union.  I saw in the response that

2    that was made in error.

3            Can you identify the purpose of that

4    payment that was made?

5        A.   That is a monthly payment paying down a

6    personal loan and the payment on my daughter's

7    vehicle.

8        Q.   Okay.  During the creditors meeting which

9    was conducted before the Office of the US Trustee, I

10   believe, John Sande participated in that for

11   Dr. Hock, I believe you testified that you had a --

12   you, the debtor, had a PPP loan from Elko Federal

13   Credit Union.

14           Do you recall that, or if I accurately

15   stated that?

16       A.   They were the middleman for the PPP loan.

17   The loan was actually made through a banking

18   relationship that they had with a bank in Utah, but

19   yes, they administered getting us the PPP loan.

20       Q.   What was the bank in Utah?

21       A.   Honestly, I do not know the name of the

22   bank.

23       Q.   When you say, "The middleman," tell me

24   what you mean by, "The middleman"?

25       A.   We went to Elko Federal for the PPP loan.

Page 15

1  We filled out all the paperwork, but the loan was

2  administered by them with a bank that they have a

3  relationship with in Utah, and the funds did come in

4  to Elko Federal, and then those funds were wired

5  into our Wells Fargo account at that time, as I

6  remember.

7       **Q.   My recollection is that you testified at**

8  **the creditors meeting that someone at Elko Federal**

9  **Credit Union said -- had orally told you that the**

10 **loan had been forgiven?**

11      A.   That's correct.

12      **Q.   Did you ever receive any documentation**

13 **regarding that?**

14      A.   There are some e-mails probably for that,

15 but not anything in writing like in a letter, no.

16      **Q.   Okay.  Do you recall who your point of**

17 **contact was with Elko Federal Credit Union?**

18      A.   I really don't, off the top of my head.

19 I'm sorry.

20      **Q.   Is there a person at the bank you**

21 **communicate with based on your personal**

22 **relationships with the credit union?**

23      A.   Well, you know, off the top of my head, I

24 cannot think of that person's name.  If I can

25 remember it before we finish, I will be glad to

BRAD BOLOTIN - 10/20/2021

Page 16

```
 1   provide it to you.
 2        Q.   Okay.  Do you recall how much money you
 3   received in the PPP loan?
 4        A.   I believe it was $10,000.
 5        Q.   Has the debtor -- did the debtor repay
 6   any of that?
 7        A.   No.
 8        Q.   Does the debtor pay for insurance?
 9        A.   I'm sorry.  I couldn't hear the question.
10        Q.   Does the debtor pay for any insurance?
11        A.   Yes.
12        Q.   What types of insurance does it pay for?
13        A.   The company has been paying for my health
14   insurance and life insurance, and that was in lieu
15   of getting payroll.
16             (Break taken at 8:27 a.m.)
17   BY MR. BUBALA:
18        Q.   We're back on.  Before we took the
19   break -- well, first of all, Mr. Blot, can you hear
20   me better?
21        A.   I can.
22        Q.   Great.  Again, if there is difficulty
23   with my audio, please let me know, and again, we'll
24   try to figure out a better solution.
25             Before we took a break, you indicated
```

BRAD BOLOTIN - 10/20/2021

Page 17

```
 1   that the firm pays for health insurance and life
 2   insurance for you; is that correct?
 3        A.   Correct.
 4        Q.   Who is the health insurance with?
 5        A.   Well, it's with -- I'm on, you know --
 6   I'm on -- what is it?  Social Security.
 7             MR. DARBY:  Medicare?
 8             MR. BOLOTIN:  I'm on Medicare, so it's
 9   with United Healthcare.
10   BY MR. BUBALA:
11        Q.   Okay.  And the life insurance, who is
12   that with?
13        A.   That is with Principal Financial.
14        Q.   How much is the life insurance?  Do you
15   know the benefit of the life insurance?
16        A.   The amount?
17        Q.   Yes.
18        A.   $800,000.
19        Q.   Is that a term policy or whole life
20   policy?
21        A.   Life.
22        Q.   When I say whole life, I mean such that
23   you have equity in that policy.  Do you understand
24   that?
25        A.   Correct.
```

BRAD BOLOTIN - 10/20/2021

Page 18

```
1          Q.    Who is the owner of the policy?

2          A.    I am.

3          Q.    When you say, "I am," do you mean you

4     personally?

5          A.    Me personally, yes.

6          Q.    Who is the beneficiary of that policy?

7          A.    The beneficiary is -- there are -- my

8     wife, Kathleen, is the beneficiary.

9          Q.    Do you know how much you pay in annual

10    premiums for that policy or how much the debtor

11    pays?

12         A.    I believe it's now 740, I don't know the

13    exact amount, Lou, but 700-plus a month.

14         Q.    Did you say a month?

15         A.    A month.

16         Q.    Are you familiar with the firm Wilson

17    Barrows?

18         A.    Yes.

19         Q.    What is the debtor's relationship with

20    Wilson Barrows?

21         A.    They're the lawyer on record for Encore

22    through the Secretary of State.  They're my lawyer

23    for the company from the standpoint of our setup

24    with the State as whatever they call them, whatever

25    they call it.  That is all we have, a relationship
```

Page 19

1    with them at this time.

2         Q.   Okay.  Are you familiar with the company

3    Wild West Mattress?

4         A.   Yes.

5         Q.   What is that company?

6         A.   That is a company that I own that Wilson

7    Barrows also is in charge of with the Secretary of

8    State for our annual.

9         Q.   Okay.  Do you recall in my motion I

10   raised a concern about a payment to Wilson Barrows?

11        A.   Yes.

12        Q.   I believe in your response you indicated

13   that was a payment for Encore's corporate filings?

14        A.   Correct.

15        Q.   What did you do to determine that that

16   was a payment for Encore's corporate filings?

17        A.   I received the request for payment from

18   Wilson Barrows to make the payment so that they

19   could go ahead and file the required paperwork.

20        Q.   Between the time that I filed my motion

21   and the time you filed your response, did you review

22   that paperwork that you received from Wilson

23   Barrows?

24        A.   Yes.

25        Q.   If you recall in my motion, I cited to

BRAD BOLOTIN - 10/20/2021

Page 20

1  your monthly operating reports.  My recollection is

2  that that was identified as a payment for Wild West

3  corporate filings.  Can you identify why it was

4  identified as such?

5       A.   I honestly have no idea.  If Encore ended

6  up paying for that, that was in error, but I can

7  tell you now, emphatically, that is being paid by me

8  personally.

9       Q.   In evaluating -- let me restart that.

10           Are you familiar with a term called a

11  preference payment?

12      A.   Yes.

13      Q.   What does that mean to you?

14      A.   It means that you pay something ahead of

15  something else, so somebody gets the benefit of that

16  payment over somebody else.  Is that correct?

17      Q.   I think that is an accurate statement.

18      A.   Okay.

19      Q.   I will add if you disagree, please let me

20  know, that in the terms of a bankruptcy, preferences

21  for entities not affiliated with the debtor, there

22  is a 90-day lookback period before the bankruptcy is

23  filed to evaluate those payments for preferences.

24           Is that a concept you're familiar with?

25      A.   Yes.

BRAD BOLOTIN - 10/20/2021

Page 21

1      Q.   Can you tell me what you did in terms of
2  evaluating whether or not there were any preference
3  payments made in the 90 days before Encore filed for
4  bankruptcy?
5      A.   You mean specifically?  I can't tell you
6  exactly what those payments were.
7      Q.   But did you do any investigation or
8  inquiry to determine whether or not any preference
9  payments were made?
10      A.   I did not.
11      Q.   Did you review any of the financials in
12  the year before the bankruptcy to determine whether
13  or not any payments should be returned?
14      A.   No.
15      Q.   In the financial reports you filed with
16  the Court, it appears that there were some refunds
17  issued for customers.  Did I read the monthly
18  operating reports correctly?
19      A.   There were a couple of refunds, yes.
20      Q.   Okay.  Do you recall if those refunds
21  were made for purchases made before or after the
22  bankruptcy?
23      A.   The payments were for -- well, I don't
24  know which one -- are you asking me about a specific
25  one?

BRAD BOLOTIN - 10/20/2021

Page 22

```
1          Q.   I'm just asking what you recall.

2          A.   I don't remember.

3          Q.   Do you know an individual named Chris,

4     and I may mispronounce this, Aramini?

5          A.   Chris Aramini.  Yes, Chris Aramini is an

6     employee of Lee Brothers Leasing.

7          Q.   Okay.  What is your relationship with

8     Mr. Aramini?

9          A.   We have a professional relationship.  We

10    lease our vehicles there.  They provided inventory

11    leasing for the company in the past.

12         Q.   Okay.  In your monthly operating reports,

13    there were payments made directly to Mr. Aramini.

14    Do you recall those?

15         A.   There were -- there was a time when there

16    was -- he did make some loans directly to the

17    company, yes.

18         Q.   Do you recall when he made a loan to the

19    company?

20         A.   I do not know the date.  I do not know

21    the dates.

22         Q.   Was it before or after you filed for

23    bankruptcy?

24         A.   It would have been before.

25         Q.   Do you recall how much he loaned the
```

BRAD BOLOTIN - 10/20/2021

Page 23

1   company?

2          A.   Somewhere around $10,000.

3          Q.   Has he been paid in full?

4          A.   He has.

5          Q.   Okay.  Was there a written agreement for

6   that loan?

7          A.   No.

8          Q.   What was the purpose of the loan?

9          A.   To purchase inventory for Encore.

10         Q.   When you say inventory, can you be more

11   specific?

12         A.   Yeah.  He loaned the company money, which

13   the money went directly into the company's accounts

14   because he always used a credit card as a way of

15   providing the funds, and we used it to purchase

16   furniture, mattresses, and audio/video.

17         Q.   Did Mr. Aramini have a security interest?

18   Was the loan collateralized in any way?

19         A.   It was not.

20         Q.   Was there any interest owed on that loan?

21         A.   Yes.

22         Q.   Do you recall what interest rate you were

23   being charged?

24         A.   I do not know the exact amount.

25         Q.   Do you have any idea how much interest

Page 24

1   you paid on that loan?

2        A.   I believe it was less than $1,000.

3        Q.   Do you recall when that loan was paid

4   off?

5        A.   I do not know the exact date.

6        Q.   Was it -- do you know if it was paid off

7   before or after Encore filed for bankruptcy?

8        A.   It was before.

9        Q.   If there are checks written to

10  Mr. Aramini after the bankruptcy was filed, do you

11  know what those checks were for?

12       A.   They would have been used -- well,

13  personally, or Lee Brothers or Bros Leasing?

14       Q.   To Mr. Aramini personally?

15       A.   That it was paid afterwards?  If it was

16  paid afterwards, it was for that loan.

17       Q.   Okay.

18       A.   I'm not aware that I did, but maybe I

19  did.  Like I said, I don't remember exactly.

20       Q.   Okay.  A clarification, I believe you

21  said Mr. Aramini made loans in a plural sense to the

22  company.  Do you recall if he made more than one

23  loan to the company.

24       A.   Absolutely, but none within that 90-day

25  period that you are speaking of, other than the one

Page 25

1    we're discussing right now.

2         Q.    Okay.  Can you identify what prior loans

3    he had made to the company?

4         A.    I cannot give you that answer.  Sorry.

5         Q.    Do you recall how much money you borrowed

6    from him in previous loans?

7         A.    There were probably three or four

8    different loans around the same $10,000 amount from

9    2018 through 2021.

10        Q.    Were there written agreements for any of

11   those loans?

12        A.    There were not.

13        Q.    Were those previous loans repaid?

14        A.    Yes.

15        Q.    Do you recall the interest rate on any of

16   those previous loans?

17        A.    I don't know the exact amount.

18        Q.    Do you recall how much interest you paid

19   on the previous loans?

20        A.    I do not.

21        Q.    Were those loans subject to a security

22   agreement or any collateral?

23        A.    There was not.

24        Q.    Can you tell me how you came to borrow

25   money from Mr. Aramini personally?

BRAD BOLOTIN - 10/20/2021

Page 26

1       A.   Because of our relationship at Lee

2   Brothers, there were times when -- they loan money

3   to their clients.  That is something that he has

4   done not just for me, but for many people that he

5   has a relationship with.  I wasn't the only one.

6            Because of our relationship that goes

7   back 20 years with Lee Brothers, I asked him

8   numerous times if there was a possibility that he

9   could loan money to the company that I could use to

10  purchase inventory on a short-term basis and repay

11  it, which I did in full.

12       Q.   Does Wild West Mattress have any

13  operations at this point?

14       A.   No.

15       Q.   Does it have any assets at this point?

16       A.   No.

17       Q.   Other than Encore, do you work for anyone

18  else?

19       A.   I'm sorry, Lou.  I couldn't hear you.

20       Q.   Yes.  Other than Encore, do you, Brad

21  blot, personally work for anyone else?

22       A.   No.

23       Q.   Do you receive compensation from anyone

24  other than Encore?

25       A.   No.

BRAD BOLOTIN - 10/20/2021

Page 27

1      Q.   Do you have a source of income other than

2  Encore?

3      A.   Yes.

4      Q.   What is that source of income?

5      A.   My wife's income from her real estate

6  business, which over the last few years while Encore

7  was reestablishing itself after COVID, she has been

8  supporting the family for the last three years.

9      Q.   Do you recall the declaration that you

10  filed in conjunction with the response to my motion?

11  I believe you testified you had repaid certain funds

12  to the debtor.

13     A.   I'm sorry.  I don't understand the

14  question.

15     Q.   I understood your declaration to state

16  that you had made personal payments back to Encore

17  to resolve any disputed payments that you received

18  previously?

19     A.   That is correct.  I made payments in

20  August and October.

21     Q.   I believe the combined amount was

22  approximately $4,500?

23     A.   That is correct.

24     Q.   Okay.  What was the source of those funds

25  that you repaid?

BRAD BOLOTIN - 10/20/2021

Page 28

1          A.    So after -- before -- the one that was

2    paid in August was I took a draw and turned right

3    back around and reimbursed the company with it.

4               The other two payments were also

5    basically the same, so as I received the money from

6    the company that was owed to me as part of my

7    salary, I chose to repay it back.

8               Since I have income from my wife for our

9    family expenses, I was able to clear up those

10   expenses to make sure that there wasn't any

11   misunderstanding that those funds needed to be paid

12   back.

13              MR. BUBALA:  I don't believe I have any

14   other questions.  I know Ms. Estes is on the line,

15   and she indicated she may have some questions for

16   you.  She has joined in the motion, so I will defer

17   to Ms. Estes.

18              MS. ESTES:  Good morning, Mr. Blot.  My

19   name is Holly Estes.  I represent Comstock -- excuse

20   me.  Just one moment.

21              I'm just going to look at my notes really

22   quick, but I do have a few questions for you.

23              MR. BOLOTIN:  Sure.

24

25

BRAD BOLOTIN - 10/20/2021

Page 29

```
 1                    EXAMINATION
 2   BY MS. ESTES:
 3        Q.   Mr. Blot, you understand you're still
 4   sworn in?
 5        A.   I do.
 6        Q.   Okay.  Again, my name is Holly Estes.  I
 7   represent Comstock Protective Services, LLC, and I
 8   just have a few questions.
 9             I believe at the 341 meeting of
10   creditors, my recollection was that you said you did
11   not have a personal bank account at that time; is
12   that correct?
13        A.   That is correct.
14        Q.   And then this morning, there was a
15   discussion that you had a checking account with Elko
16   Federal; is that correct?
17        A.   I haven't had a checking account with
18   Elko Federal for like two or three years.
19        Q.   Sure.  That is my next question.  When
20   did that checking account get closed with Elko
21   Federal?
22        A.   We had a store out in Elko, which is, by
23   the way, one of the reasons that we had the account
24   out there.  The account has been closed since, I
25   would say 2018, if I'm even close.
```

BRAD BOLOTIN - 10/20/2021

Page 30

1         The only thing we have is a -- I have a

2    loan, a monthly payment.  That is all I have with

3    Elko Federal.

4         Q.   **The loan and the car payment for your**

5    **daughter's Honda?**

6         A.   It's a combined loan.

7         Q.   **Oh, I see.**

8         A.   They consolidated it.

9         Q.   **I see.  Uh-huh.  Then with regard to your**

10   **health insurance, I believe your testimony this**

11   **morning was that you had a new health insurance, and**

12   **it was through United Healthcare; is that correct?**

13        A.   Well, since -- well, I'm 68 years old, so

14   from the time I was 65 to current is when I was with

15   United Healthcare through Medicare.

16        Q.   **Okay.  So for the last three years, would**

17   **you say?**

18        A.   Yes, yes.

19        Q.   **Okay.  What is the monthly health**

20   **insurance payment?**

21        A.   Well, there is, you know, there's A,

22   there's B, there's C.  I'm going to say the combined

23   amount is somewhere between $500 and $700.  I don't

24   even think it's that much.

25        Q.   **That is the monthly payment amount?**

BRAD BOLOTIN - 10/20/2021

Page 31

1      A.   It is.

2      Q.   Uh-huh.  With regard to Chris Aramini --

3 am I saying his name correctly?

4      A.   Yes.

5      Q.   Is that the person who you have dealt

6 with when you lease vehicles through Lee Brothers?

7      A.   Yes.  Well, they have two companies.

8 They have Bros Leasing, and they have Lee Brothers.

9           Lee Brothers was taken over by the Dolan

10 Group, but in the past, Bros Leasing was owned by

11 Chris, his brother, and the original owner of Lee

12 Brothers, Michael Lee, and so those continue to

13 operate simultaneously out of the same office over

14 where Lee Brothers has their showroom.

15     Q.   Okay.  Chris was the owner of that

16 company; is that what I understand?

17     A.   He was never owner of Lee Brothers.  He

18 was general manager.  It was owned by Michael Lee

19 until Dolan purchased it.

20          Bros Leasing is owned by and still owned

21 by John Aramini, Chris Aramini, and Michael Lee.

22     Q.   And you leased the vehicles through Bros

23 Leasing or Lee Brothers?

24     A.   The vehicle leasing is through Lee

25 Brothers and the inventory financing was done

BRAD BOLOTIN - 10/20/2021

Page 32

1  through Bros Leasing, and that was also where the

2  payments went back to.

3          When the money was loaned to me from

4  Chris, the money came out of Bros Leasing.  Now,

5  what he did with it after we made the repayment, I

6  have no idea.

7      **Q.   So the relationship between yourself or**

8  **the debtor and Bros Leasing is that loans were made**

9  **from Bros Leasing to the debtor for inventory?**

10      A.   Correct.

11     **Q.   Chris is the owner or an owner of Bros**

12  **Leasing?**

13      A.   Yes.

14     **Q.   I know you testified you didn't know when**

15  **the other loans were made, but you did testify other**

16  **loans had been made.  Were those other loans made by**

17  **Bros Leasing?**

18      A.   Some were made by Bros and some were made

19  by Chris personally.

20     **Q.   Uh-huh.  Do you know the time period of**

21  **when those loans were made?**

22      A.   Not off the top of my head, but what I

23  can tell you is they were way before 90 days before

24  the filing.

25     **Q.   Okay.  Are they 180 days before the**

Page 33

1   filing?

2          A.   I don't remember that, and I don't know,

3   is that relevant?

4               MR. DARBY:  Brad, just answer the

5   questions.  Don't ask questions.

6               MR. BOLOTIN:  I can't tell you the exact

7   amount of when, the dates of those, but they were a

8   while ago, other than the one that I testified to

9   earlier when Lou asked me the question.

10  BY MS. ESTES:

11         Q.   Uh-huh.  Were there any loans that were

12  made within nine months of the filing?

13         A.   I don't recall.

14         Q.   Within one year?

15         A.   You know, again, I can't tell you the

16  exact date off the top of my head.  I'm sorry, and I

17  don't want to guess.

18         Q.   Within two years?

19              MR. DARBY:  Holly, he explained this to

20  you.  He is not going to answer this question.

21              Are we going to ask about three, four,

22  five, six, and seven?  He just told you he doesn't

23  know.  He is not going to continue to answer every

24  theoretical time period you can come up with.

25              MS. ESTES:  Well, I am just trying to get

BRAD BOLOTIN - 10/20/2021

Page 34

1   a sense of when the loans were made, Kevin.

2   Sometimes, when you ask these types of questions,

3   the deponent can say, Oh, gosh, it was at least

4   three years back.

5   BY MS. ESTES:

6       Q.   With regard to the prior loans, was there

7   any documentation related to those loans?

8       A.   I believe I answered that question when

9   Lou asked me.  The answer is no.

10      Q.   Okay.  But always, the money was

11  deposited into a bank account for the business?

12      A.   Correct.

13      Q.   Which bank account would that money have

14  been deposited in?

15      A.   Wells Fargo.

16      Q.   Into the Wells Fargo account, okay.

17           How is the decision made about who would

18  loan the money, whether it would come from Bros

19  Leasing, or from Chris Aramini?

20      A.   I have no idea.  If I went to Chris,

21  Chris would decide who would make it, him personally

22  on a credit card, or whether it would be through

23  Bros Leasing.

24      Q.   Uh-huh.  And how long have you known

25  Chris?

BRAD BOLOTIN - 10/20/2021

Page 35

```
 1          A.   Twenty-plus years.
 2          Q.   And when you first met 20-plus years ago,
 3    how did you come to know him?
 4          A.   Leasing vehicles from Lee Brothers.  At
 5    that point in time, we were just a client.
 6          Q.   I see.
 7          A.   And that goes all the way back to my
 8    previous company, Wild West Electronics.
 9          Q.   Uh-huh.  You had a consistent
10    relationship with him over that 20 years?
11          A.   Yes.
12               MR. DARBY:  Is that a question or a
13    statement?
14               MR. BOLOTIN:  Yeah.  Is that a question
15    or a statement?
16    BY MS. ESTES:
17          Q.   No.  I was asking you a question.  Have
18    you had a relationship with him over the last 20
19    years consistently?
20          A.   Yes.
21          Q.   And with regard to this loan for
22    approximately $10,000, what was the repayment term
23    of that loan?
24          A.   Pay it back as soon as you can, and he
25    charged me a small amount of interest.
```

BRAD BOLOTIN - 10/20/2021

Page 36

1        Q.   And the interest was just for $1,000?

2   There was no -- was there a percentage interest rate

3   or an agreed amount for interest?

4        A.   When the loan was ready to be paid off,

5   he would provide me with what the interest amount,

6   which -- like I said, I know it was less than $1,000

7   on the $10,000.

8        Q.   So it was just upon repayment that you

9   find out what the interest rate is?

10       A.   Most of the loans were short-term, so 90

11   days, 60 days, 120 days.  Again, I wish I could be

12   more specific, but I cannot.

13       Q.   Uh-huh.  Is that your testimony, that the

14   prior loans, the repayment term -- what were the

15   repayment terms for the prior loans?

16       A.   There wasn't really -- he would loan the

17   money to the company and expect to get paid back

18   within a reasonable period of time.

19            MR. DARBY:  Holly, I'm going to have to

20   ask, almost all these questions were asked by Lou,

21   and we're not going to ask the same questions over

22   and over in hopes of catching a witness in a trap.

23            We're coming to the point where I'm going

24   to advise him not to answer questions that have all

25   been asked and answered.  These have all been

BRAD BOLOTIN - 10/20/2021

Page 37

1    answered.

2              MS. ESTES:  Well, they haven't, Kevin.

3    I'm just trying to get a little bit more specific.

4              MR. DARBY:  We don't need to argue.  Just

5    go to your next question.  Go to your next question.

6              MS. ESTES:  Uh-huh.

7              MR. DARBY:  Uh-huh.

8              MS. ESTES:  I don't think I have any

9    other questions at this time.

10             MR. DARBY:  Can we have one moment to go

11   off the record real quick?  I need to ask my client

12   something.

13             MS. ESTES:  Sure.

14                 (Break taken at 9:07 a.m.)

15             MR. DARBY:  Lou, do you have any

16   follow-up questions?

17             MR. BUBALA:  I do not.  Any rebuttal?

18             MR. DARBY:  No, not at this time.

19             (Deposition concluded at 9:08 a.m.)

20

21

22

23

24

25

BRAD BOLOTIN - 10/20/2021

Page 38

```
 1   STATE OF NEVADA        )
                            )   ss.
 2   COUNTY OF WASHOE       )

 3

 4              I, KATE MURRAY, a duly commissioned and

 5   licensed court reporter, Washoe County, State of

 6   Nevada, do hereby certify:

 7              That I reported the taking of the

 8   deposition of BRAD BOLOTIN, commencing on Wednesday,

 9   October 20th, 2021, at 8:09 a.m.

10              That prior to being examined, the witness

11   was duly sworn to testify to the truth.  That I

12   thereafter transcribed my said shorthand notes into

13   typewriting and that the typewritten transcript of

14   said deposition is a complete, true and accurate

15   transcription of said shorthand notes.

16              I further certify that I am not a

17   relative or employee of an attorney or counsel of

18   any of the parties, nor a relative or employee of an

19   attorney or counsel involved in said action, nor a

20   person financially interested in the action.

21

22              DATED:  At Reno, Nevada this 25th day of

23   October, 2021.

24                            KATE MURRAY, CCR #599

25
```

BRAD BOLOTIN - 10/20/2021

Page 39

1                          ERRATA SHEET

2

3

4    I declare under penalty of perjury that I have read the

5    foregoing _____ pages of my testimony, taken

6    on _____ (date) at

7    _____(city), _____(state),

8

9    and that the same is a true record of the testimony given

10   by me at the time and place herein

11   above set forth, with the following exceptions:

12

13   Page  Line   Should read:                    Reason for Change:

14   ___  ___     _____    _____

15                _____    _____

16   ___  ___     _____    _____

17                _____    _____

18   ___  ___     _____    _____

19                _____    _____

20   ___  ___     _____    _____

21                _____    _____

22   ___  ___     _____    _____

23                _____    _____

24   ___  ___     _____    _____

25                _____    _____

BRAD BOLOTIN - 10/20/2021

Page 40

1                              ERRATA SHEET

2      Page   Line   Should read:              Reason for Change:

3

4      ___   ___     _____    _____

5                    _____    _____

6      ___   ___     _____    _____

7                    _____    _____

8      ___   ___     _____    _____

9                    _____    _____

10     ___   ___     _____    _____

11                   _____    _____

12     ___   ___     _____    _____

13                   _____    _____

14     ___   ___     _____    _____

15                   _____    _____

16     ___   ___     _____    _____

17                   _____    _____

18

19     Date:   _____    _____
                                 Signature of  Witness
20
                               _____
21                               Name Typed or Printed

22

23

24

25

BRAD BOLOTIN - 10/20/2021

Page 41

1        HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2    Litigation Services is committed to compliance with applicable federal

3    and state laws and regulations ("Privacy Laws") governing the

4    protection and security of patient health information. Notice is

5    hereby given to all parties that transcripts of depositions and legal

6    proceedings, and transcript exhibits, may contain patient health

7    information that is protected from unauthorized access, use and

8    disclosure by Privacy Laws. Litigation Services requires that access,

9    maintenance, use, and disclosure (including but not limited to

10    electronic database maintenance and access, storage, distribution/

11    dissemination and communication) of transcripts/exhibits containing

12    patient information be performed in compliance with Privacy Laws.

13    No transcript or exhibit containing protected patient health

14    information may be further disclosed except as permitted by Privacy

15    Laws. Litigation Services expects that all parties, parties'

16    attorneys, and their HIPAA Business Associates and Subcontractors will

17    make every reasonable effort to protect and secure patient health

18    information, and to comply with applicable Privacy Law mandates,

19    including but not limited to restrictions on access, storage, use, and

20    disclosure (sharing) of transcripts and transcript exhibits, and

21    applying "minimum necessary" standards where appropriate. It is

22    recommended that your office review its policies regarding sharing of

23    transcripts and exhibits - including access, storage, use, and

24    disclosure - for compliance with Privacy Laws.

25            © All Rights Reserved. Litigation Services (rev. 6/1/2019)